UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                    CASE NO. 2:11-cr-20468-AJT-MKM

v.

BABUBHAI PATEL,

        Defendant.
_____/

**DEFENDANT BABUBHAI PATEL'S
SENTENCING MEMORANDUM**

Defendant BABUBHAI PATEL, by and through undersigned counsel, respectfully submits this memorandum in aid of sentencing, along with attached letters, for this Honorable Court's consideration in determining an appropriate sentence for Mr. Patel's conviction.

**I.    INTRODUCTION**

On August 10, 2012, a jury found Mr. Patel guilty of conspiracy to commit health care fraud, aiding and abetting health care fraud, conspiracy to distribute controlled substances and distribution of controlled substances. In its Memorandum in Aid of Sentencing, the Government portrays Mr. Patel as the devious architect of a sprawling criminal conspiracy, a man responsible for "one of the most sweeping health care fraud and drug distribution schemes ever seen in this jurisdiction." (Doc. 634 at 1).

This memorandum presents a more balanced view of Mr. Patel. In the eyes of his family, friends and associates, Mr. Patel is a loving father, a respected member of the community, and a magnanimous self-made man renowned for his generosity. With the

exception of the conduct at issue here, Mr. Patel has lived a life wholly devoid of criminal activity and has, in fact, demonstrated an exemplary commitment to bettering himself and the lives of others in the Indian-American community. It is hoped that this memorandum will provide a more nuanced perspective of Mr. Patel and thereby assist the Court in fashioning a sentence both sufficient, but no greater than necessary to satisfy the goals of sentencing as codified at 18 U.S.C. § 3553(a)(2).

## II. SENTENCING GUIDELINES CALCULATION

The Probation Office arrived at an offense level of 40 and a criminal history category of I. Thus, range of imprisonment under the calculations of the Probation Office would be 292 to 365 months. Mr. Patel has no objection to the calculation of his criminal history. He does, however, have several objections to the offense level, which are discussed in turn.

1. The Government has not Carried its Burden in Establishing that the Loss Amount Exceeded $7,000,000.

Instead of supplying concrete evidence regarding the loss amount, the Government offers unreliable estimates derived from anecdote, speculation and flawed logic. As such, this Court should reject the Government's calculation of the loss amount at issue here. When applying section 2B1.1(b)(1) to determine the amount of loss, the district court must make a "reasonable estimate" to arrive at the appropriate amount. *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (quoting U.S.S.G. § 2B1.1 cmt. n. 3(C)). The Government bears the burden of establishing the loss amount by a preponderance of the evidence. *Id*. While a statistical estimate may provide a sufficient basis for calculating the amount of loss, the Government must demonstrate the accuracy of any statistical extrapolation. *Id*.

In *Jones*, a health care fraud prosecution, the Government attempted to establish the loss amount by "adopting statistical extrapolation evidence presented by the United States at trial."

*Id*. at 711.  Specifically, the Government presented the following evidence:

> a statistician for the United States identified a representative sample of Jones's bills from 2001 to 2004 that charged code 11421. This sample consisted of 357 bills spread across 264 patients. The United States located Jones's patient files for only 210 out of the 264 patients in the sample size. Taking those 210 files, the United States's podiatry expert, John Stephens, testified that Jones had up-coded the bills in each of them. In forming his conclusion, Stephens noted that certain procedures were missing entirely from the bills that would have accompanied a code 11421 if an excision had actually been performed, such as post-operative procedures, anesthesia, and lab reports. The United States alleged that this statistical extrapolation method established that one hundred percent of Jones's bills for code 11421 from 2001 to mid–2005 were fraudulent, resulting in a loss of $224,133.
>
> Additionally, [an employee] testified that while she worked for Jones, he instructed her to bill code 11421 when she shaved calluses. Furthermore, an investigator from the Department of Health and Human Services, Special Agent Fairbanks, testified that Jones's bills for code 11421 cost Medicare and Medicaid more than $200,000, but he did not supply an explanation for this figure. Jones based his incorrect billing history on a misunderstanding of the billing codes.

*Id*. at 709-10.  The district court adopted the loss amount advanced by the Government without making any specific factual findings regarding the evidence of loss amount.  *Id*.

The Sixth Circuit reversed, finding the loss calculation inadequate.  *Id*.  The appellate court noted that "a statistical estimate may provide a sufficient basis for calculating the amount of loss caused by a defendant," but the analysis in *Jones* was flawed because the Government provided only 210 of the 264 patient files.  *Id*. at 712.  The Government also provided no testimony that would allow the district court to conclude that the 210 files provided a representative sample of the billing practices at issue.  *Id*.  Therefore, "the accuracy of the extrapolation method [was] called into question."  *Id*.

Here, as in *Jones*, the Government provides inadequate evidence in support of its claimed loss amount.  According to the Government, the loss amount flows from two separate sources: (1) Mr. Patel's relationship with the Visiting Doctors of America ("VDA"); and (2) all other drug

transactions originating from the Patel Pharmacies. With respect to the VDA, the Government asserts that 100% of the billing was fraudulent. (Doc. 634 at 9).

The most obvious problem with the calculation is that it seeks to hold Mr. Patel responsible for 100% of the VDA oxycodone distribution, despite the fact that the jury acquitted Mr. Patel of all criminal liability related to this controlled substance. Mr. Patel does not dispute the current state of the law allows acquitted conduct to provide the basis for a sentencing enhancement. However, holding Mr. Patel responsible for 100% of a set of transactions for which the jury found him 0% criminally liable would reduce the jury verdict to a nullity. The Court should not countenance such a perverse outcome.

Setting aside this inherent flaw in the Government's calculation, the Government has not otherwise carried its burden of establishing that Mr. Patel distributed the proposed amount of drugs. Instead of providing concrete evidence in support of this assertion, such as a representative sample of fraudulent bills, the Government relies upon the testimony of co-conspirators and the testimony of a law enforcement officer regarding a single police raid. None of the co-conspirators' testified that 100% of the VDA billing was fraudulent. In fact, their testimony calls this estimate into question.

For instance, Arpit Patel's testimony shows that he lacked sufficient knowledge to evaluate the entirety of the VDA transactions because he admitted that Mehul Patel handled the VDA prescriptions prior to the end of 2009, when Arpit Patel became involved in the VDA transactions. (Tr. Vol. 9 at 37-38). In addition, Arpit Patel testified that even when he was writing the prescriptions, many of the controlled medications were prescribed under the advice of a doctor, who would visit the patient with a chart documenting the visit, a fact that suggests that not all of the prescriptions were illegitimate. (Tr. Vol. 9 at 53). It was only in mid-2010 that

Arpit Patel began to sign blank prescriptions for both controlled and non-controlled substances. (Tr. Vol. 9 at 62). However, Arpit Patel stopped writing VDA prescriptions in December 2010, (Tr. Vol. 17 at 31), prior to the conclusion of the VDA transactions, which the Government alleges ceased in January 2011. (Doc. 634 at 9). Thus, given the limited temporal scope of his involvement in the VDA transactions and the statements suggesting that not all the VDA billing was fraudulent, Arpit Patel's testimony is not a reliable basis for the Government to conclude that 100% of the VDA billing was fraudulent.

Likewise, Pinakeen Patel provided direct testimony that undermines the Government's VDA estimate. Pinakeen Patel testified, for instance, that non-controlled "maintenance medication" was "usually" distributed to patients. (Tr. Vol. 17 at 120). In addition, Pinakeen Patel affirmed that there were both "regular pharmacy practices" and "regrettable ones," which suggests that not all of the VDA billing was fraudulent but instead fell within the regular pharmacy practices. (Tr. Vol. 17 at 123). Finally, when asked to estimate the amount of fraudulent billing, Pinakeen Patel stated that 80% to 85% of the billing was fraudulent.[1] (Tr. Vol. 17 at 125). He did not elaborate on the percentage of the VDA transactions that he believed were fraudulent. Therefore, the testimony of Pinakeen Patel directly contradicts the Government's VDA estimate.

Similarly, the testimony of Lavar Carter and Michael Gracer does not support the estimate. Mr. Carter was only one recruiter, so he could not possibly provide insight regarding the entirety of the VDA transactions. Likewise, Michael Gracer described only one specific raid. Thus, the testimony of these witnesses does not provide an adequate basis for the sweeping conclusion that 100% of the VDA transactions were fraudulent. Accordingly, Babubhai Patel

---

[1] The reliability of this estimate is questionable given the records that demonstrate that McKesson was paid nearly $47 million, which is inconsistent with Pinakeen Patel's claim that the drugs were returned to McKesson for profit. (*See* Tr. Vol. 17 at 108, 147-48).

maintains that the Government has not carried its burden of providing reliable evidence in support of its claim that 100% of the VDA billing was fraudulent.

More troubling still is the Government's claim regarding the scope of the fraudulent billing in non-VDA transactions. The Government estimates that 25% of the total non-VDA billing is fraudulent. (Doc. 634 at 11). The logic behind this estimate is as follows: Babubhai Patel is recorded stating that a pharmacy's profit margin should equal 25% of the amount of gross billing; therefore, 25% of the total non-VDA billing was fraudulent. (Doc. 634 at 10-11).

This reasoning is fatally flawed. Even if Mr. Patel instructed all of the pharmacists that he expected a 25% profit margin, it does not follow that 25% of the transactions were fraudulent. The estimated national average profit margin for independent pharmacies is 22%-24% of gross billing. *See* National Community Pharmacists Association, 2010 NCPA Digest, Executive Summary at 1, available at http://www.ncpanet.org/pdf/digest/2010/2010digestexecsum.pdf. It is entirely conceivable that a pharmacy could attain a profit margin of 25% without engaging in any fraudulent billing. Or, conversely, it is possible that a pharmacy could engage in fraudulent billing 75% of the time, but, because of other inefficiencies associated with the pharmacy, earn profits that equal less than 25% of gross billing. Simply put, the target profit margin is not probative of the percentage of fraudulent transactions that occur in a pharmacy, and the Government presented no credible evidence that 25% of the billing submitted by the Patel pharmacies was fraudulent. Accordingly, this Court should reject the Government's arbitrary and logically-flawed estimate of the non-VDA loss amount.

As an alternative, Mr. Patel proposes that the Court use the most reliable concrete evidence regarding the loss amount associated with this offense: the worth of the seized drugs, which, according to the Government is between $300,000 and $500,000. (*See* Doc. 634). This

would enhance Mr. Patel's sentence by 12 to 14 points.

### 2. Mr. Patel did not Abuse a Position of Trust.

The Government incorrectly asserts that Mr. Patel's offense level should be enhanced by two points under U.S.S.G. § 3B1.3. According to the Government, Mr. Patel abused a position of trust with respect to: (1) Medicare, Medicaid and insurance providers; and (2) the general public. (Doc. 634 at 16). Both bases are invalid under the guideline notes. Under § 3B1.3, a defendant's sentence may be enhanced "if the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (2010).

Application Note 1 provides the following guidance regarding public or private trust:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3, cmt. n. 1 (2010).

The Government concedes that it has not located any appellate decisions that approve the imposition § 3B1.3 enhancements on pharmacists situated similarly to Mr. Patel. Thus, to justify the enhancement, the Government analogizes the conduct of Mr. Patel to that of medical doctors who write fraudulent prescriptions. This analogy is faulty. It is well-settled that "the level of discretion . . . is the definitive factor in determining whether a defendant held and abused a

7

position of trust." *United States v. Humphrey*, 279 F. 3d 372, 379-80 (6th Cir. 2002).

A doctor has discretion to prescribe any drug from a wide array of pharmaceutical products. By contrast, a pharmacist operating under Michigan law has no comparable discretion. *See* MICH. STAT. § 333.17751(7) ("If all other requirements of this part are met, a pharmacist *shall* dispense a drug or device under a prescription described in this subsection.") (emphasis supplied). Generally speaking, a pharmacist must prescribe the drugs in a prescription and is therefore more akin to a bank teller or a hotel clerk than a medical doctor. As such, the lack of discretion inherent in the position precludes the abuse of trust enhancement.

This is not to say that a pharmacist may never abuse a position of trust. Indeed, it is important to distinguish this case from cases where the victim of the crime is a *patient*, whose misplaced trust in his pharmacist to supply unadulterated, safe drugs led to disastrous consequences. *See*, *e.g.*, *United States v. Courtney*, 362 F.3d 497 (8th Cir. 2004) *vacated and remanded*, 543 U.S. 1098 (2005). Here, the Government does not proceed under the theory that patients were victims, but instead maintains that the victims are Medicare, Medicaid and the insurance providers, or, alternatively, the general public. Yet, the Government has not demonstrated any "fiduciary duty" or "special relationship of trust," *United States v. Fuchs*, 635 F.3d 929, 933, 937 (7th Cir. 2011), between Mr. Patel and the insurance providers or the general public. Instead, the transactions that give rise to the purported abuse of trust are more akin to commercial transactions, for which the abuse of trust enhancements are generally inappropriate. *See id*. Therefore, since the transactions at issue involved no special trust on the part of the victims, this Court should decline to impose the requested § 3B1.3 enhancement.

3. <u>The Government has not Provided Reliable Evidence in Support of its Estimates regarding Drug Quantities.</u>

The Government seeks to hold Mr. Patel responsible for the distribution of 12,691

8

dosage units of Oxycontin, an amount that equals 100% of the 80 milligram units distributed in connection with the VDA transactions. (Doc. 634 at 17). According to the Government, these units equate to a marijuana equivalency of 6,802 kilograms.[2] (Doc. 634 at 17). Aside from anecdotal testimony of various co-conspirators, none of whom provided competent testimony regarding the specific amount of Oxycontin that was fraudulently prescribed, and the unsupported assertion that 100% of the VDA transactions were fraudulent, the Government offers no evidentiary support for its calculation. This Court must not accept such unreliable estimates, particularly since Mr. Patel was acquitted of the Oxycontin-related offenses.

"A defendant involved in a drug conspiracy is generally responsible for the drug quantities for which he is directly involved and any quantity that is a reasonably foreseeable consequence of the conspiracy." *United States v. Velez*, 485 F. App'x 793, 799 (6th Cir. 2012) *cert. denied*, 133 S. Ct. 557 (U.S. 2012) (citing *United States v. Caver*, 470 F.3d 220, 246 (6th Cir. 2006)). The Government must establish the drug quantities by a preponderance of the evidence. *Id*. "Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1 cmt. n.12 (2010). In determining the amount, the court may consider, for example, "the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." *Id*. Estimates of quantity amounts are appropriate "so long as it errs on the side of caution and likely underestimates the quantity of drugs actually attributable to the defendant." *Velez*, 485 F. App'x at 799 (quoting *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008)).

---

[2] Interestingly, the PSR calculates drug quantity of the Oxycodone to be 13,051 units with a marijuana equivalency of only 13.51 kilograms. (PSR at 11). Probation has not explained how it arrived at its estimated drug quantity.

Here, the Government errs on the side of speculation and overestimates the percentage of drugs attributable to Mr. Patel. As noted, the Government asks the Court to hold Mr. Patel responsible for 100% of the VDA Oxycontin transactions, despite the fact that the jury found that Mr. Patel did not commit a single one of these transactions. Again, Mr. Patel concedes that acquitted conduct may provide the basis for a relevant conduct enhancement. However, the quantities at issue still must be supported by competent evidence, and it is inherently unreasonable to entirely override a jury verdict in the manner recommended by the Government. Thus, for the reasons articulated in the objection related to the loss amount, Mr. Patel strenuously objects to the assertion that 100% of the VDA transactions were fraudulent and the attribution of 12,691 dosage units of Oxycontin. Accordingly, this Court should reject the assertion that Mr. Patel's offense level should be enhanced based on the unsupported figures relied upon by the Government.

As in the calculation regarding loss amount, Mr. Patel submits that the only concrete and reliable evidence regarding the amount of contraband at issue is the amount of drugs seized by the Government. The extent to which the amount of drugs contained controlled substances is unclear from the submissions of the Government and Probation. The Court should determine the appropriate amount at the sentencing hearing and use that number to determine Mr. Patel's relevant conduct drug quantity enhancement.

### III. REQUEST FOR DOWNWARD VARIANCE

In the event that the Court determines that the recommendations of the Government or Probation are appropriate, Mr. Patel respectfully requests that this Court enter a downward variance based upon his specific characteristics and the facts of this case. In the wake of *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory only. Judges now

have power to impose sentences that are *no greater than necessary* to satisfy the statutory purposes of sentencing, to consider all of the characteristics of the offender and circumstances of the offense, and to reject advisory guidelines that are not based on national sentencing data and empirical research. *See Booker*, 543 U.S. 220; *Rita v. United States*, 127 S.Ct. 2456 (2007); *Gall v. United States*, 552 U.S. 38, 50 (2007); *Kimbrough v. United States*, 128 S.Ct. 558 (2007). A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," but the court "may not presume that the Guidelines range is reasonable*." Gall v. United States*, 552 U.S. 38, 50 (2007).

Moreover, a district court has the power to vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears v. United States*, 129 S.Ct. 840, 843 (2009) (emphasis added). The district court has the discretion to conclude that the resulting advisory range "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 128 S.Ct. at 575 (2007). Thus, though this Court is required to consider the factors under 18 U.S.C. § 3553(a) set forth below, it need not accept the "utter travesty of justice that sometimes results from the Guidelines' fetish with abstract arithmetic." *United States v. Adelson*, 441 F.Supp. 2d 506 (S.D.N.Y. 2006). In light of the specific facts of this case, Mr. Patel respectfully asks the Court to consider a substantial downward variance from the sentence requested in the PSR and that recommended by the Government.

1. <u>The Nature and Circumstances of the Offense and the History and Characteristics of the Mr. Patel.</u>

The jury found Mr. Patel guilty of serious crimes. Mr. Patel does not wish to minimize the societal harm wrought by the abuse of controlled pharmaceutical products or the damage that fraud imposes on the institutions of Medicare and Medicaid. Yet, despite his depiction by the

11

Government, Mr. Patel has not lived the life of a criminal mastermind. In fact, aside from the aberrant criminal conduct at issue in this case, Mr. Patel's story demonstrates why the United States remains a beacon of hope to underprivileged masses across the world.

Mr. Patel was born to a machine operator in Gujarat, India, the fourth of six children. In 1989, Mr. Patel followed his father to Chicago, where the elder Patel had already moved. Intent on making a better life for himself and his family, Mr. Patel earned an associate's degree in pre-pharmacy and later earned his pharmacy degree here in Michigan, where he has remained ever since. Despite these humble roots, Mr. Patel came to own and operate over twenty pharmacies in the greater-Detroit area. As the Government correctly notes, a person "does not start and operate a large chain of independent pharmacies, employing tens if not hundreds of people, and billing over $60 million to various insurers without being a vigorous, disciplined, and capable organizer and businessman." Moreover, as recognized by the Government Mr. Patel's "intellectual and organizational strengths could have been of great value to the community."

The letters submitted show that Mr. Patel is a well-respected respected member of the Indian-American community, both in Michigan as well as in the Chicago area. Mr. Patel has demonstrated a penchant for generosity over the years, and has set an example for many in the community of the value of hard work and education. This Court should not disregard these testaments to Mr. Patel's value to his community, particularly since the letters are submitted in spite of the considerable disrepute that comes as a natural consequence of his criminal prosecution.

But Mr. Patel is more than a successful pharmacist and a pillar of the community. As is clear from the letters submitted, Mr. Patel is a loving husband, who has been motivated to provide better opportunities for his family than he himself enjoyed. One son, Anish Patel,

studies full-time at Wayne State University, while his other son, Smit Patel, remains a student in high school but plans to attend college. Unfortunately, both of these youths will have to become accustomed to life without their father, who will, in all likelihood, miss their graduations. Indeed, given his age, if Mr. Patel is sentenced in accordance with the recommendations offered by the Government, he will likely die in jail. Moreover, Mr. Patel's wife, Jyotsanaben, has been unable to secure work since Mr. Patel's indictment, and the family has been forced to subsist on the support of their family and friends. The severe dislocations in the Patel family will continue and should be considered by the Court in determining Mr. Patel's punishment. *See* U.S.S.G. §5H1.3 (2010) ("[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.").

Again, the purpose of submitting the attached letters of support and recounting these facts is not to minimize the serious nature of the crimes for which Mr. Patel was convicted, but to demonstrate the depth of affection of those whose lives he has enriched over the years. The letters are also intended to provide context for the man who will come before this Court to be sentenced. Mr. Patel trusts that this Court will, as it must, impose a sentence that accounts for his specific, positive attributes. However, Mr. Patel also trusts that this Court recognizes that the punishment for his crimes has already begun, both in the disgrace and humiliation he has already suffered during the course of trial, and in the prospect that he will never again be able to work as a pharmacist or purge the indelible stain on his reputation.

2. The Need for the Sentence Imposed.

The Court must impose a sentence that reflects the seriousness of the offense and

promotes respect for law and also affords adequate deterrence to protect the public from similar conduct on the part of others. 18 U.S.C. § 3553(a). Again, it is undeniable that the fraudulent conduct for which Mr. Patel was convicted is serious. But it is equally undeniably that political pressure has pushed the Sentencing Commission to increase sentences for fraud over the last 20 years, despite numerous studies that have shown shorter sentences provide adequate deterrence for white collar fraud offenders. *See*, *e.g.*, Frank O. Bowman, III, *Pour encourager les autres? The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments That Followed*, 1 OHIO ST. J.CRIM. LAW 373, 419 (2003-2004) ("A general increase in federal economic crime sentences might have been justifiable on deterrence grounds if there were evidence that existing penalties were failing to deter potential offenders. One indicator of insufficiently stringent penalties for a class of crimes would be an increase in the general incidence of such crimes. However, the available statistics show exactly the opposite trend for economic offenses."); *see also* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Indeed, these studies demonstrate that the deterrent effect of these ever-longer sentences for white collar fraud has been minimal. *Id*. Thus, there are serious policy problems associated with strict adherence to the sentencing guidelines in cases of fraud where the loss amounts drive criminal penalties far beyond that which is necessary to serve the goals of sentencing. In light of the substantial increase in such sentences over the last twenty years without any corresponding

empirical evidence provided in support of the increase, this Court should give minimal weight in the § 3553(a) analysis to the guidelines recommendation for his fraudulent conduct. *See Spears v. United States*, 555 U.S. 261 (2009) (sentencing judges may vary from the guidelines based on policy disagreements).

Of course, Mr. Patel was also convicted of distribution of controlled substances. No further specific deterrence is necessary with respect to these counts, as Mr. Patel will never again be permitted to engage in the practice of pharmacy and, as such, is incapacitated from committing these crimes. Moreover, given Mr. Patel's age, his first-offender status, his employment history and his lack of history of drug or alcohol abuse, there is a statistically low rate of recidivism. *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004); *see also* United States Sentencing Commission, *Recidivism and the "First Offender", A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* (May 2004) (offenders with no prior arrests or convictions have the lowest recidivism rate).

This Court may consider these factors in determining whether a downward variance is appropriate. *See*, *e.g.*, *Pepper v. United States*, 129 S. Ct. 1229, 1241 (2011) ("[A]lthough the 'Guidelines should be the starting point and the initial benchmark,' district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a)"); *United States v. Hamilton*, 323 Fed. App'x. 27, 31 (2d Cir. 2009) (district court "abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines."); *United States v. Chase*, 560 F.3d 828, 830-32 (8th Cir. 2009) (district court erred in declining to consider defendant's advanced age, prior military service, health issues, employment history, and lack of criminal history). As such, Mr. Patel

submits that a downward variance from the sentences recommended by the Government and Probation is warranted.

3. <u>The Kinds of Sentences Available</u>.

Mr. Patel agrees with Probation's assessment that a lower variance sentence is available to the Court. As noted, Mr. Patel asks that this Court exercise its discretion and enter a lower variance sentence in this case.

4. <u>The Need to Avoid Unwarranted Sentencing Disparities among Defendants with Similar Records who have been Found Guilty of Similar Conduct.</u>

Mr. Patel submits that this Court should sentence him in a manner consistent with the sentences of his co-defendants in this case. Mr. Patel notes that Dinesh Kumar Patel pled guilty pursuant to a Rule 11 plea agreement to conspiracy to commit healthcare fraud and conspiracy to distribute controlled substances with a sentence guideline range of 70 to 87. (Doc. 483). Pinakeen Patel pled guilty pursuant to a Rule 11 agreement to a guidelines range of 63 to 78 months. (Doc. 292). In addition, Kartik Shah pled 70 to 87 months pursuant to his Rule 11 Plea Agreement. (Doc. 490). Finally, undersigned counsel has been informed that Brijesh Rawal and Ashwini Sharma were recently sentenced to 66 and 68 months respectively. Mr. Patel asks that this Court take these sentences into consideration when determining the appropriate sentence in this case.

## IV. **CONCLUSION**

Based on the foregoing, Mr. Patel respectfully asks this Court for leniency and discretion in fashioning a sentence that is not greater than that necessary to punish the conduct at issue in this case.

DATED this 30th day of January, 2013.

Respectfully submitted,

/s/ Robert L. Sirianni, Jr.
Robert L. Sirianni, Jr., Esq.
Brownstone, P.A.
Florida Bar No. 684716
400 North New York Ave.
Suite 215
Winter Park, FL 32789
Telephone:  407-388-1900
Email:  Robert@brownstonelaw.com
*Counsel for Mr. Patel*

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2013, I electronically filed the foregoing paper with the clerk of the court using the CM/ECF system, which will send notification of such filing to the following: Wayne Pratt, John Neal and Julie Beck, Assistant U.S. Attorneys.

/s/ Robert L. Sirianni, Jr.
Robert L. Sirianni, Jr., Esq.