UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,              CR. NO.  11-20468-1

       v.
                                            HON. ARTHUR J. TARNOW

BABUBHAI PATEL,

                    Defendant.

---

SUPPLEMENTAL BRIEF IN SUPPORT OF MR. PATEL'S PRO SE
MOTION FOR A REDUCTION IN SENTENCE UNDER 3582(c)(1)(A)

For the last 17 months, Babubhai Patel has lived at home without incident. Nonetheless, it appears likely that Mr. Patel will be sent back to prison – not because he violated the rules of his release, or because he committed a new crime, or because he poses a danger to society. Rather, Babubhai Patel will be sent back to prison because his timing is unlucky: he is four months short of qualifying for expedited commutation of his sentence under a new Biden-Harris clemency program. As such, despite his success upon release from prison and under supervision of the Detroit halfway house, Mr. Patel faces the looming threat of return to prison.

Mr. Patel respectfully moves this Court for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) based on several extraordinary and compelling reasons: (i) the Bureau of Prisons ("BOP") transferred Mr. Patel to home confinement pursuant to its

authority under the CARES Act, after deciding he was a low-risk offender; (ii) at the time of the transfer, the BOP conveyed to Mr. Patel that, if he followed the rules, he would complete his sentence on home confinement; (iii) over the past 17 months, Mr. Patel has successfully complied with every restriction imposed on him; (iv) because of a change in Department of Justice policy earlier this year, the BOP now must return Mr. Patel to a correctional facility within 30 days after the pandemic ends; (v) Mr. Patel is just four months shy of eligibility for expedited clemency consideration under the Biden-Harris program announced this month; and (v) forcing Mr. Patel to return to prison would irreparably damage the renewed family, employment, and community ties he has built during the past year-and-a-half. After weighing the relevant factors under 18 U.S.C. § 3553(a), this Court should find that Mr. Patel has already completed a sentence that is "sufficient, but not greater than necessary" to satisfy the goals of sentencing and reduce his sentence to time served.

## I.   BACKGROUND

In 2012, a jury found Mr. Patel guilty of eleven counts of healthcare fraud and sixteen counts of aiding and abetting distribution of controlled substances. (ECF No. 720.) On February 1, 2013, the Court sentenced Mr. Patel to 204 months' incarceration. Mr. Patel had been in custody since his arrest on August 2, 2011.

## A.   Mr. Patel has successfully served more than half of a 204-month sentence for his non-violent offenses

Mr. Patel has one blemish on an otherwise impeccable institutional record in the BOP. Two months after his arrest, while at the Federal Detention Center (FDC) at Milan, Mr. Patel was accused of property destruction by "messing with the computer."[1] (Exhibit A – Disciplinary History.) Since that incident, he has had no other infractions during his decade in the BOP. He worked as an Administrative Orderly and received satisfactory work evaluations. (Exhibit B – Progress Report at 1.) The BOP labeled Mr. Patel a "minimum" security level. (Exhibit B at 1; Exhibit F – BOP Risk Level.)

While in BOP custody, Mr. Patel had two thyroid surgeries – one in 2014 and one in 2019 -- to remove growing nodules.  (Exhibit C – BOP Health Problems, at 1.) Pathology reports for these nodules showed "hyperplasia" which is an increase in the number of cells in an organ or tissue that is not yet cancer, but is often the initial stage in the development of cancer.[2] *Id.* Mr. Patel was also diagnosed with pre-diabetes beginning in 2012,  and hyperlipidemia – or high cholesterol –in 2015. *Id.* at 1-2.

Mr. Patel has served 122 months of his 204-month sentence. With statutory good time credit, he has served approximately 141 months – nearly 70% of his sentence. (*See*

---

[1] This Court held multiple hearings in 2011 about Mr. Patel's difficulties reviewing discovery on the computers at FDC Milan. *See* ECF Nos. 892, 893. The Court heard testimony about broken CD drives on the FDC laptops, and testimony that Mr. Patel relied on prison staff to insert and eject all CDs. The Court declined to conclude that Mr. Patel had broken computer equipment. ECF No. 893, PageID.5365.

[2] For a definition of hyperplasia, see the NIH's National Cancer Institute, *Dictionary of Cancer Terms* (last visited Oct. 5, 2021).

Exhibit D – Public Data Sheet.) The BOP also projects that Mr. Patel will be eligible for release as an elderly offender on December 1, 2022, under its Elderly Offender Two-Thirds program. (Exhibit D - Public Data Sheet.) Mr. Patel is currently 59 years old. Without any kind of early release, Mr. Patel's release date is February 8, 2026.

**B.      The BOP transferred Mr. Patel to home confinement in April 2020 after finding that he posed a minimal risk of reoffending.**

In March 2020, in response to the COVID-19 public health emergency, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act). PL 116-136, Mar. 27, 2020, 134 Stat. 281. Among other things, the CARES Act authorized the Director of the BOP to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" under 18 U.S.C. § 3624(c)(2). In a memorandum to the Director of the BOP, the Attorney General conveyed that "in assessing which inmates should be granted home confinement," the agency should "consider the totality of the circumstances for each individual inmate, the statutory requirements for home confinement, and [a] non-exhaustive list of discretionary factors" that included the individual's specific:

(i)      age and vulnerability to COVID-19;
(ii)     security level, with priority for low- and minimum-security inmates;
(iii)    disciplinary record, with priority for those with no violent or gang-related activity and no infractions in the last year;
(iv)    PATTERN score, with priority for those with a minimum score;
(v)     re-entry plan; and
(vi)    offense and potential danger to the community.

Attorney General Memorandum[3], Mar. 26, 2020 (hereinafter "AG 2020 Memo").

Applying this "aggressive[]" screening process, the BOP determined that Mr. Patel qualified for home confinement.[4] On April 24, 2020, the BOP transferred him to Cherry Health Community Treatment Center, a Detroit Residential Reentry Management Center (RRM) that would oversee his home confinement. At the time of the transfer, the BOP took the position that CARES Act recipients would remain on home confinement for the duration of their sentences unless they violated the RRM's written rules. *See infra*, Sections II.A.2 and II.A.4. Neither the BOP nor the RRM informed Mr. Patel that he would be returned to a correctional facility when the pandemic ends. (*See* Exhibit H – Cherry Health GPS Agreement; Exhibit I – BOP Conditions of Home Detention; Exhibit J – BOP Transfer Documents.)

### C.    Mr. Patel has fully complied with the strict conditions of home confinement for the past 17 months.

Mr. Patel lives with his wife in Canton, Michigan. As a general matter, he cannot leave his home, even to go on a walk, without prior written approval. He spends his time at home caring for his wife, who has multiple serious medical issues, including aortic valve regurgitation and stenosis, bicuspid aortic valve, hypertension, diabetes, osteoporosis, kidney stones, class one obesity, high cholesterol, and thyroid disorder. (*See* Exhibit K – Mrs. Patel Medical Documents (sealed).) For her conditions, Mrs. Patel

---

[3] The AG March 2020 Memo is available at "Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic."
[4] See Bureau of Prisons, Update on COVID-19 and Home Confinement, Apr. 5, 2020.

takes approximately ten different medications each day. *Id.* Mr. Patel takes care of all the household chores and daily living tasks for his wife, including cooking and cleaning. Mr. Patel cannot, however, take care of tasks outside of the home. He cannot go grocery shopping or run other errands. He has only recently been permitted to accompany his wife to her medical appointments, if he can apply for and receive an approved pass in time. Mr. Patel was permitted to attend religious services after a year of perfect compliance. He is not permitted to attend family gatherings.

Mr. Patel is motivated to secure employment so that he can begin making restitution payments. His employment search has been restricted by the rules of home confinement and the RRM. Mr. Patel must request passes 48 hours in advance for any outing. (*See* Exhibit H – Cherry Health GPS Agreement.) This rule has proved an impediment to his acceptance of employer-scheduled job interviews, physicals, drug tests, and even first days of multiple job opportunities – all of which Mr. Patel reports he is often notified only 24 to 36 hours in advance. On the occasions Mr. Patel has overcome these hurdles and managed to secure a job, the rule that the RRM must verify and approve the employment has kept Mr. Patel from showing up for his first day of work.[5] (Exhibit L – Letter from Global Recruiters Branch Manager.) Mr. Patel's employment search is also narrowed by two personal factors: first, he seeks "third shift"

---

[5] Mr. Patel's RRM case manager recently informed undersigned counsel that the RRM recently lost both Employment Specialists on site, meaning there is currently no one in those job roles at Cherry Health, and the responsibility for employment verification and approval has apparently shifted to the case managers until those jobs are filled.

employment so that he can still care for his wife during the day; second, he has chronic back pain and thus cannot pursue jobs involving strenuous physical labor.

Over the last several months, Mr. Patel has had approximately six job interviews, four of which resulted in employment offers. Mr. Patel was not able to appear to work at any of those four jobs, however, due to the RRM not approving his employment in time. Recently, with the assistance of undersigned counsel, Mr. Patel attended a job interview, made it to the required physical and drug test, and is hopeful he will receive an offer. He will again bring this offer to the RRM to verify and approve his employment in time for his first day of work.

Despite the restrictions on his activities and daily life, Mr. Patel has managed to achieve some modicum of stability and positive reentry. For example, he requested and received special permission from his RRM Supervisor to take three walks per week around his neighborhood, because he recognized this would benefit Mrs. Patel's health and his own. As mentioned above, he recently obtained permission to request passes to accompany his wife to her medical appointments (he previously could only request passes for his own medical appointments). And perhaps most importantly, Mr. Patel has exhibited perseverance and persistence in his efforts to obtain employment despite the many hurdles the RRM imposes.

### D.     Mr. Patel has exhausted his administrative remedies.

Mr. Patel submitted a pro-se written request for a reduced sentence to the Warden of FCI Terre Haute. ECF No. 1705, PageID.22018. On March 17, 2021, the

Warden responded denying Mr. Patel's request for a Reduction in Sentence. *Id.*, PageID.22021. Because more than 30 days have passed since Mr. Patel submitted the request, and because the BOP denied his request, this Court is authorized to consider his motion for compassionate release. 18 U.S.C. § 3582(c)(1)(A).

###    E.    Mr. Patel does not qualify for the Biden-Harris Expedited Clemency Program.

In August 2021, President Biden's Office of Legal Counsel at the Justice Department announced that it agreed with a Trump-era memorandum, opining that the thousands of prisoners who had been released on CARES Act home confinement would be required to return to prison at the end of the "pandemic emergency period."[6] The conclusion drew criticism and calls to action by both Democratic and Republican lawmakers, with some suggesting commutation of those individuals' sentences as a way around the legal interpretation that the law would send individuals back to prison.

In response, the Biden Administration created an expedited clemency review process for individuals on home confinement under the CARES Act. White House Spokesperson Andrew Bates announced the general criteria of the expedited process: "The Administration will start the clemency process with a review of non-violent drug offenders on CARES Act home confinement with four years or less to serve."[7]

---

[6] Charlie Savage & Zolan Kanno-Youngs, *Biden Legal Team Decides Inmates Must Return to Prison After Covid Emergency*, N.Y. TIMES (July 19, 2021).
[7] Sam Stein, *Biden starts clemency process for inmates released due to Covid conditions*, POLITICO (Sept. 13, 2021).

On September 10, 2021, the Department of Justice circulated a Memorandum with a list of inmates it had identified who met the criteria – that they were non-violent offenders and that they had 48 months or less remaining to serve -- who may be considered for expedited clemency. *See* Exhibit E – DOJ Clemency Memo to RRMs. Those individuals – and "only" those individuals (*id.*) – would be invited to submit their clemency application, through their RRM counselor, for expedited review.[8]

This expedited commutation process excludes Mr. Patel. Although he is a non-violent offender released on home confinement under the CARES Act, he does *not* have 18 to 48 months left to serve.[9] Mr. Patel has 52 months remaining on his sentence – four months more than the 48-month cutoff required to be considered for expedited clemency review. His case manager at the Detroit RRM confirmed for undersigned counsel that Mr. Patel is *not* on the circulated list of individuals who qualify for expedited commutation.

Outside of the expedited clemency review project, the Office of the Pardon Attorney (OPA) reports more than 11,000 pending applications for commutation.[10] In evaluating commutation requests, the OPA states: "The possibility that the Department itself could accomplish the same result by petitioning the sentencing court, through . .

---

[8] There is no indication from the administration that there will be another list or another round of individuals identified for expedited clemency review

[9] The expedited clemency review project Memo does not specify whether non-violent offenders with both non-drug and drug counts of conviction are eligible for relief.

[10] DEPT. OF JUSTICE, *Clemency Statistics* (updated Sept. 21, 2021).

. a request for compassionate reduction in sentence under 18 U.S.C. Section 3582(c)(1), will also bear on the decision whether to recommend Presidential intervention in the form of clemency."[11] As such, petitioning this Court is Mr. Patel's best avenue for relief.

## II.    ARGUMENT

Section 3582(c)(1)(A), as amended by the First Step Act of 2018, vests this Court with the authority to reduce a sentence if: (1) the defendant presents "extraordinary and compelling reasons" warranting a sentence reduction; (2) a reduction would be consistent with "applicable policy statements" issued by the Sentencing Commission; and (3) the § 3553(a) sentencing factors merit a reduction.  As the Sixth Circuit has held, however, there is currently no applicable policy statement governing § 3582(c)(1)(A) motions filed by defendants. *United States v. Jones*, 980 F.3d 1098, (6th Cir. 2020). "Until the Sentencing Commission updates § 1B1.13 . . ., district courts have full discretion . . . to determine whether 'an extraordinary and compelling' reason justifies a compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion." *Id.* at 1109. *See also United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020); *United States v. Long*, 997 F.3d 342 (D.C. Cir. 2021); *United States v. Shkambi*, 993 F.3d 388 (5th Cir. 2021); *United States v. Aruda*, 993 F.3d 797 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035 (10th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020).

---

[11] JUSTICE MANUAL, § 9-140.113, "Standards for Considering Commutation Petitions."

A combination of factors in Mr. Patel's case presents extraordinary and compelling reasons for relief.

**A.      Mr. Patel Presents "Extraordinary and Compelling Reasons" For a Reduction to Time Served Under 18 U.S.C. § 3582(c)(1)(A).**

**1.   Mr. Patel's selection as a CARES Act recipient is extraordinary.**

The selection of Mr. Patel as a CARES Act recipient, for which the BOP engaged in an "aggressive[]"screening process, is evidence of the agency's determination that he poses an extremely low risk of reoffending. *See* AG 2020 Memo. Following the criteria outlined by the AG 2020 Memo, the BOP considered "the totality of the circumstances" that included Mr. Patel's age, vulnerability to COVID-19, security level, disciplinary record, PATTERN score, re-entry plan, offense conduct, and potential danger to the community. *Id.*

The totality of these factors as to Mr. Patel clearly favored release. He is nearly 60 years old, an age at which recidivism is low and COVID complications are high. Recidivism rates drop significantly with age.[12] Meanwhile, Mr. Patel's age group has four times the rate of hospitalization from a COVID infection, and thirty times the rate of death.[13] In addition to his age vulnerability, Mr. Patel suffered from hyperlipidemia,

---

[12] U.S. SENTENCING COMM'N, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 7, 2017).
[13] CDC, "Risk for COVID-19 Infection, Hospitalization, and Death by Age Group" (updated Sept. 9, 2021).

pre-diabetes, and thyroid disorders, including nodules with potentially cancerous tissues. (Exhibit C – BOP Health Problems List.)

Mr. Patel's risk assessments routinely assigned him a "minimum" risk level – the lowest possible level. (Exhibit F – BOP Risk Level.) He had no disciplinary infractions since the incident that occurred two months into his incarceration at FDC Milan. Finally, Mr. Patel's reentry plan included living at home with his wife, who has serious medical conditions herself.

Given the rigorous standards adopted by the BOP, Mr. Patel's selection for home confinement was extraordinary. Of the entire BOP population, only about 2.7% were ultimately selected for transfer to home confinement under the CARES Act.[14]

### 2. The BOP's intent that Mr. Patel and other CARES Act transfers serve the "remainder" of their sentence on home confinement is compelling.

BOP representatives have repeated in the halls of Congress and in district courts that it intended prisoners released to home confinement to remain there for the rest of their sentence. In testimony before Congress, the Director of the BOP, Michael D. Carvajal, twice confirmed that last year's recipients of transfers to home confinement under the CARES Act would remain there "for service of the remainder of their

---

[14] The BOP currently reports a total population of 155,826. *See* BOP Population Statistics (updated October 1, 2021). BOP Director Carvajal reported that roughly 4,300 individuals were on CARES Act Home Confinement as of April 2021. *See* Statement of Michael D. Carvajal Before the Senate Judiciary Committee, April 15, 2021.

sentences."[15] And in at least one district court proceeding, the BOP explained that one reason it chose to place individuals on CARES Act home confinement was to avoid the uncertainty of "temporary, but indeterminate, release[s], because nobody can be sure when the pandemic will end." *See United States v. Bayard*, No. 18-cr-0771, Govt. Letter Brief, Att. 1, ECF No. 34-1 (S.D.N.Y. July 23, 2020).

Similarly, the Attorney General's March 2020 memo to the BOP does not contain any suggestion that CARES Act recipients would be returned to prison following the pandemic. *See* AG 2020 Memo. Instead, the memo contemplates an extension of home confinement—the traditional final step in the release process: "Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release." *Id.*

Likewise, the government has taken the position in compassionate release litigation that a transfer to home confinement obviated a defendant's compassionate release request because he would remain at home for the duration of his sentence. For example, in *United States v. Levi*, the government argued to the district court that the BOP could not "arbitrarily and without cause" re-incarcerate the defendant because home confinement exists to allow former inmates "to adjust and prepare for [their] re-

---

[15] Statement of Michael D. Carvajal and Dr. Jeffery Allen Before the Senate Judiciary Committee, at 6 (June 2, 2020); Statement of Michael D. Carvajal Before the House Committee on the Judiciary Subcommittee on Crime, Terrorism, and Homeland Security, at 6 (Dec. 2, 2020).

entry into the community." *United States v. Levi*, 04-0235 (D. Kan.) ECF No. 2033-2, at 1-2 (citing BOP Program Statement 7320.01, CN-2(1)(c)). In further support of its position, the government submitted the declaration of Susie Morseman, Regional Correctional Programs Administrator for the BOP's Mid-Atlantic Regional Office, which stated: "[I]nmates transferred to home confinement pursuant to the CARES Act will remain on home confinement for the duration of their sentence." *Levi*, ECF No. 2033-3. Ms. Morseman added that although "the Bureau has the authority to transfer inmates back into a Bureau facility, there [was] no intent to do so, unless the terms of home confinement are violated." *Id.*

Other district courts have soundly rejected the government's argument that home confinement obviates the need for compassionate release. These courts note that a defendant on home confinement remains within the BOP's legal custody until the expiration of his term. 18 U.S.C. § 3624(c)(2); *see United States v. Williams*, No. 90-0135, ECF No. 1307 at 11-12 & n.14 (D. Md. Mar. 12, 2021) (granting compassionate release for defendant on CARES Act home confinement over government's objection to relief and "conten[tion] that Mr. Williams's transfer to home confinement 'resolves any issues related to [his] continued confinement in a prison environment'"); *United States v. Findley*, No. 17-0315, ECF No. 51 at 1 n.3 (D. MD. Jan. 29, 2021) (granting compassionate release for defendant on CARES Act home confinement, noting that "[defendant] remains within the BOP's legal custody and is subject to being returned to a prison facility"); *United States v. Hope*, 2018 WL 358490, at *4 (D. Mont. Jan. 10, 2018) (same).

Recognizing that home confinement does not terminate one's "confinement," district courts have granted compassionate release to CARES Act recipients. *See, e.g.,* *United States v. Busby*, 16-cr-0211, ECF No. 133 (N.D. Tex. Apr. 20, 2021)[16]; *United States v. Salvagno*, 02-cr-0051 (N.D.N.Y. Aug. 5, 2020); *United States v. Gamboa*, 09-cr-1741 (D.N.M. June 11, 2020); *United States v. Camp*, 11-cr-0155 (E.D.N.C. June 21, 2019); *see also United States v. Levi*, 04-cr-0235-29, ECF No. 2085 (D. M.D. July 6, 2021) (reducing sentence to time served for defendant who had been transferred to home confinement under the CARES Act but was subsequently returned to custody on an alleged minor violation of release conditions).

Finally, the paperwork provided to Mr. Patel upon his transfer to home confinement is consistent with all of the statements by BOP staff discussed above. The documents indicate only that Mr. Patel could be returned to a prison facility if he violates the rules of his home confinement. (*See* Exhibit H – Cherry Health GPS Agreement; Exhibit I – BOP Conditions of Home Detention; Exhibit J – BOP Transfer Documents.) They provide no notice from which to infer that Mr. Patel would be returned to custody at the end of the pandemic emergency period. *Id.*

---

[16] In *Busby*, the government opposed compassionate release on the sole ground that the defendant's motion was moot because the BOP had directed him to serve the remainder of his sentence on home confinement. The court held: "[T]he remaining portion of Defendant's 78-month custodial sentence remains intact. The BOP's home-confinement designation only means that Defendant is permitted to serve the remaining portion of his [] sentence at home under the supervision of the BOP. Still, should he violate the terms of his home confinement, the BOP could rescind the designation and re-incarcerate him." ECF No. 133, at 2-3.

### 3. Mr. Patel's 17-month record of success outside prison is compelling.

The exceptionally low rate of recidivism among CARES Act recipients is evidence of the BOP's success in identifying appropriate federal inmates to transfer to home confinement. In testimony before Congress, BOP Director Carvajal stated that only *one* of the roughly 4,300 individuals designated for home confinement under the CARES Act had committed a new crime.[17] Mr. Patel was not that individual.

Quite the opposite: Mr. Patel has not violated one rule or had any negative encounter with RRM staff since his release 17 months ago. Instead, he has dutifully cared for his wife since his release, easing the burden of household chores. His good behavior allowed him privileges such as attending temple and establishing a walking routine with his wife – activities that sound simple but are only available to individuals in good standing with the RRM. Mr. Patel attends regular meetings with his RRM case manager and hosts her for home visits once per month "for accountability tracking."

Mr. Patel's success in acclimating to life outside prison walls is not surprising considering that home confinement is designed for the "final months" of a person's sentence and not as a "temporary" reprieve within one's term. 18 U.S.C. § 3624(c)(1); *United States v. Mungin*, 97-cr-1105, 2020 WL 2847927, at *2 (S.D.N.Y. June 2, 2020); *see also, e.g., United States v. Ogarro*, 18-cr--0373, 2020 WL 1876300, at *6 (S.D.N.Y. Apr. 14,

---

[17] Statement of Michael D. Carvajal Before the Senate Judiciary Committee, April 15, 2021.

2020) (§ 3524(c)(2) gives the BOP authority "to permit prisoners to finish the remainder of their sentence in home confinement"); *United States v. Ramirez-Ortega*, 11-cr-0251, 2020 WL 4805356, at *3 (E.D. Pa. Aug. 18, 2020) ("[T]he CARES Act expanded the authority of the ]BOP] to transfer federal inmates to home confinement to serve the remainder of their sentence.").

### 4. It is extraordinary and compelling that the DOJ's current policy requires the BOP to return Mr. Patel to prison within 30 days of the pandemic's end.

On January 15, 2021, the Department of Justice Office of Legal Counsel ("OLC") released a memorandum stating that when the pandemic ends, the BOP must return to prison all CARES Act recipients who otherwise do not qualify for home confinement under § 3624(c)(1). Slip Opinion: Home Confinement of Federal Prisoners After the COVID-19 Emergency, Jan. 15, 2021. It concludes that the CARES Act authorized the extended use of home confinement only for the duration of the "covered emergency period," defined as "the period beginning on the date on which the President declared a national emergency" and "ending on the date that is 30 days after the date on which the national emergency declaration terminates." Sec. 12003(a).

Following the OLC memo, the government has acknowledged the change in DOJ policy, agreeing that within 30 days of the pandemic's end, the BOP will return to physical custody any person on home confinement who does not otherwise qualify for the program. *See United States v. Calhoun*, No. 08-cr-0077, ECF No. 505 (S. D. Miss. May 14, 2021) (granting motion for compassionate release in case where government

"concede[d]" defendant would be returned to prison "pending policy decisions from the Department of Justice").; *see also Williams*, 90-cr-0135, ECF No. 1307 at 12 n.14 (noting that the defendant, who was not "otherwise eligible for home confinement," would be returned to BOP custody once the covered emergency period ends).

Thus, after the pandemic, because Mr. Patel does not qualify for home confinement under § 3624, he will be re-incarcerated in a BOP correctional facility. Per the OLC Memo, his re-incarceration is not a matter of discretion. It is mandatory, regardless of Mr. Patel's compliance with every condition placed on him and without regard to the familial responsibilities he has borne over the past 17 months.

### 5. Mr. Patel's return to prison would irreparably damage the renewed family, employment, and community ties he has built over the past year

Mr. Patel's successful reentry following prison is well underway. Forcing Mr. Patel to return to a correctional facility after the pandemic would irreparably damage the renewed family, employment, and community ties he has built over the past 17 months. As discussed above, Mr. Patel does as much as allowed under the RRM rules to care for his wife, including cooking, cleaning, laundry, and all daily in-home tasks. He has had success obtaining employment offers, but the RRM's failure to verify and approve those jobs has kept Mr. Patel from actually working. *See* Exhibit L – Letter from Global Recruiters Branch Manager. *See also supra*, Section I.C.

In addition to damaging Mr. Patel's reentry, re-incarceration following the pandemic may constitute a violation of his due process rights. The Supreme Court has

recognized that a person has a constitutional right not to be transferred to a more restrictive confinement setting if it imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). And federal appeals courts have held that the disparity between home confinement and confinement in a correctional facility is stark enough to trigger the Due Process Clause. *See Ortega v. U.S. Immigration and Customs Enforcement*, 737 F.3d 435, 439 (6th Cir. 2013) ("[T]ransfer from home confinement to prison confinement . . . amounts to a sufficiently severe change in conditions to implicate due process."); *Paige v. Hudson*, 341 F.3d 642, 643 (7th Cir. 2003) (transferring probationer from home confinement to jail constitutes "sufficiently large incremental reduction in freedom to be classified as a deprivation of liberty" to trigger due process). This is because despite all the ways in which home confinement is a sentence of "confinement," it is decidedly different than being locked inside a government-run facility. "[U]nlike institutional confinement of any kind," home confinement allows participants "to live with their loved ones, form relationships with neighbors, lay down roots in their community, and reside in a dwelling" rather than a cell. *Gonzales-Fuentes*, 607 F.3d at 890. "A prison cot is not the same as a bed, a cell is not the same as a home, from every vantage point: privacy, companionship, comfort. And the privileges available in each are worlds apart." *Ortega*, 737 F.3d at 439. Indeed, even the BOP recognizes that a person's placement on

home confinement is a protected liberty interest that demands due process protections before it is terminated.[18]

For these reasons, Mr. Patel has established extraordinary and compelling reasons his sentence should be reduced.

### B.    A Time-Served Sentence is "Sufficient, But Not Greater Than Necessary" to Accomplish the Goals of Sentencing Under § 3553(a)

Under § 3582(c)(1)(A), when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant §3553(a) factors to determine whether, and to what extent, a sentence reduction is warranted. Under *Pepper v. United States*, 562 U.S. 476 (2011), courts must also consider post-offense developments, which provide "the most up-to-date picture" of the defendant's history and characteristics. *Id.* at 492. After considering all of the circumstances in this case—including Mr. Patel's non-violent conduct, rehabilitative progress, and low risk of recidivism—this Court should conclude that a time-served sentence is "sufficient but not greater than necessary" to satisfy the purposes of sentencing under § 3553(a).

Mr. Patel's offenses, while certainly serious, were non-violent. Mr. Patel was never known to be armed or display any violent tendencies. Importantly, he had no

---

[18] *See* BOP Program Statement 7320.01, Home Confinement, at 6 (Sept. 6, 1995) (updated and reissued Dec. 15, 2017); BOP Program Statement 5270.09, Inmate Discipline Program (July 8, 2011) (updated and reissued Nov. 18, 2020); 28 C.F.R. § 541.3.

prior criminal history and has aged considerably since the time of his convictions. All of Mr. Patel's co-defendants have been released; for more than two years, Mr. Patel has remained the only individual still in BOP custody, and he is set to remain so until 2026.

During his time in prison, Mr. Patel had but one infraction. (Ex. A.) Overall, he productively used his time in custody, working as an orderly, and taking programs related to health and wellness. (Ex. B.) His conduct on home confinement has been without incident.

As to recidivism, the BOP already has applied an "aggressive" set of criteria to determine that Mr. Patel poses an extremely low risk. *See United States v. Privette*, No. 07-cr-0133 (E.D.N.C. Oct. 10, 2019) ("[T]hat Privette was deemed eligible to be released to home confinement demonstrates that the BOP does not consider him to be a danger to the community.") The fact that Mr. Patel has successfully abided by all conditions of confinement over the last 17 months reinforces the accuracy of the BOP's assessment, especially considering that the agency has re-incarcerated CARES Act recipients even for violating low-level or technical rules.[19]

Upon transfer from federal prison to the Detroit RRM, Mr. Patel's RRM case manager evaluated him using a series of validated assessment tools.[20] Mr. Patel scored

---

[19] *See, e.g.,* Justin Moyer and Neena Satija, *A grandmother didn't answer her phone during a class. She was sent back to prison*, The Washington Post (June 26, 2021); Jamie Roth, *COVID allowed Raquel Esquivel and 4,500 others to be released from overcrowded federal prisons. So why is she back behind bars?*, Business Insider (Aug. 13, 2021).

[20] Perversely, the treatment recommendations identified at the end of Mr. Patel's RRM report include that he "will successfully release from the RRC program." Ex. G at 7.

in the lowest category, "No Risk or Stable" on each dimension of the assessments, except his biomedical conditions and complications. (Exhibit G – RRM Intake Assessment (sealed).) During that assessment, just 72 hours after being released from prison, Mr. Patel told his case manager he would like to find employment. *Id.* at 4. He has worked persistently, despite numerous hurdles, to obtain employment. He would like to remain employed and productively living in the community, rather than return to prison only to disrupt the progress he has gained while on home confinement.

Finally, even after Mr. Patel's custodial time ends, he will immediately begin a three-year term of supervised release under this Court's supervision. During that period, if Mr. Patel fails to abide by any standard or special condition of supervised release, he may be subject to an additional sentence of incarceration and an additional term of supervised release.

## CONCLUSION

For the extraordinary and compelling reasons presented here—including the BOP's determination that Mr. Patel posed a minimal risk of reoffending and could be safely returned to the community, the BOP's intent that CARES Act recipients serve the remainder of their terms on home confinement if they complied with the rules, Mr. Patel's full compliance with the rules during the past 17 months of home confinement, and the damage that re-incarceration would inflict on his rehabilitative progress, family relationships, and community ties—Mr. Patel respectfully requests that this Court grant compassionate release by reducing his sentence to time served.

CERTIFICATE OF SERVICE

I certify that the foregoing document was filed this date using the CM/ECF
system which will send notification to all parties of record.

s/Jennifer Mellas
Paralegal

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER**

Dated: October 8, 2021

s/Amanda N. Bashi
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5845
E-mail: amanda_bashi@fd.org